UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION


JOHNELL LEDOUX and ARVET                  : CASE NO:
LEDOUX, INDVIDUALLY AND ON
BEHALF OF THEIR MINOR CHILD.
Plaintiff,
                                          : JUDGE

V.                                        :


TURNER NETWORK TELEVISION, INC.,     : MAGISTRATE JUDGE
ET ALS.                              : JURY TRIAL DEMAND


## COMPLAINT FOR DAMAGES

I.

## STATEMENT OF JURISDICTION

This is a complaint for damages for personal injury based upon Louisiana law between

**JOHNELL LEDOUX AND ARVET LEDOUX, INDIVIDUALLY AND ON BEHALF OF**

**THEIR MINOR CHILD,** residents of the State of Louisiana domiciled in Calcasieu Parish on

the one hand; and defendants, persons, firms, and corporations domiciled in other States as set

forth hereinbelow. This Complaint is also for damages arising from the defendants' violation of

Plaintiff Johnell Ledoux's civil rights guaranteed to him by the Fifth and Fourteenth

Amendments to the Constitution of the United States, and in violation of a statute of the United

States, namely 42 U.S.C 1983, for personal injury, punitive damages, and attorney fees and

costs. This Court has jurisdiction over all claims pursuant to 28 U.S.C. 1331; 28 U.S.C. 1332;

and, as applicable, 28 U.S.C. 1367. Venue is proper within the Western District of Louisiana

because all, or a substantial part, of the actions occurred within this District and most witnesses to the underlying facts are domiciled within the District, including the underlying Louisiana criminal case whose favorable resolution to plaintiff, "State of Louisiana vs. No. 16448-2015 Johnell LeDoux," was delivered by a Calcasieu Parish jury on November 8, 2017.

## II.

## DEFENDANTS

Made defendants herein are the following:

### 1.

**TURNER NETWORK TELEVISION, INC.** is a corporation domiciled at 1050 Techwood Drive NW, Atlanta, GA 30318 operating as **TURNER NETWRK TELEVISION, A/K/A "TNT."**

### 2.

**WOLF FILMS, INC.** is a corporation domiciled at 100 University Center Plaza, Suite 2252, Universal City, CA.

### 3.

**MAGICAL ELVES, INC., is** a corporation domiciled at 6255 Sunset Boulevard, Suite 1600, Los Angeles, CA 90028, operating as a subsidiary of Timopolis PLC, a United Kingdom chartered company operating worldwide as The Tinopolis Group.

### 4.

**KELLY SIEGLER**, an individual domiciled in Harris County, Texas, upon whom service may be had at 1200 Binz Street, Suite 200, Houston, TX, 77002-4205.

5.

**CASEY GARRETT,** an individual domiciled in Harris County, Texas, upon whom service may be had at 440 Louisiana Street, Suite 900, Houston, TX, 77002-4205.

6.

**ALICIA O'NEILL,** an individual domiciled in the District of Columbia, upon whom service may be had at 602 Pennsylvania Avenue, NW, Suite 900, Washington, D.C. 20004.

7.

**JESSE ALVARADO,** an individual domiciled in Los Angeles County, California, upon whom service may be had in care of the Los Angeles County Public Defender's Office, 210 W. Temple Street, 19th Floor, LOS ANGELES, CA 90012.

### FIRST CAUSE OF ACTION

**Conspiracy to violate the civil rights of Johnell Ledoux by procuring false testimony, by coercing, incentivizing, and otherwise securing the significant assistance of State officials in the performance of a public function, resulting in the indictment, malicious prosecution, invasion of privacy, false imprisonment, and trial of a bogus rape charge which resulted in a unanimous jury acquittal of plaintiff, all in violation of 42 U.S.C. 1983, and contrary to the Fifth and Fourteenth Amendments to the Constitution of the United States**

1.

This case arises from the production for profit of an episode of so-called "Reality Show Television" called "Cold Justice: Sex Crimes," which was written, produced, televised and aired on various Cable Television networks and television streaming services, beginning August 7, 2015, and continuing until at least October 1, 2018.

3

2.

During the course of those activities, the defendants conspired with each other, and with officials of the State of Louisiana and its political subdivisions, to produce, stage, and fictionalize events surrounding a consensual sexual act between 19-year-old Johnell Ledoux and a 34-year-old crack-addicted prostitute which occurred October 30, 1992. The incident was investigated at the time by the most experienced sex crimes investigator in Calcasieu Parish, Denise Hughes, and the file was closed without charges. Twenty-two years later, these defendants targeted Ledoux for prosecution of the charges as a so-called cold case, and in the course of the investigation they procured, by incentivizing, coercing, combining with, and publicly promoting a new set of officers in the same department which had closed the case, and as a result, manufactured a scenario which led to Plaintiff Johnell Ledoux being charged and ultimately indicted for aggravated rape. As a result of those charges, Ledoux was arrested on May 15, 2015, and held in lieu of posting $850,000 bail until he was released following his acquittal on November 8, 2017.

3.

Turner Network Television, Inc. ("TNT"), Wolf Films, Inc. (hereinafter "Wolf"), Magical Elves, Inc. nka Gemini Magical Elves, Inc. (hereinafter "Magical Elves"), Kelly Siegler (hereinafter "Siegler"), Casey Garrett (hereinafter "Garrett") and Alicia O'Neill (hereinafter "O'Neill"), and Alvarado engaged in a conspiracy to produce this "reality" segment. Reality Television is accurately described on Wikipedia as "a genre of television programming that documents supposedly unscripted real-life situations, and often features an otherwise unknown case of individuals who are typically not professional actors. . .Reality television has faced significant criticism since its rise in popularity. Much of the criticism has centered on the use of

4

the word 'reality', and such shows' attempts to present themselves as a straightforward recounting of events that have occurred. Critics argue reality television shows do not accurately reflect reality, in ways both implicit (participants being placed in artificial situations) and deceptive (misleading editing, participants being coached on behavior, storylines generated ahead of time, scenes being staged)." The whole list was used in this case, which led directly to the violation of Ledoux's right to privacy, right to due process, wrongful imprisonment, malicious prosecution, and other injuries.

4.

The defendants' collective investigations, which occurred in 2015, were an attempt to resurrect a closed case[1] and resulted in a shocking and egregious disregard for Ledoux's rights. The defendants' collective actions did not serve the public good but, rather, were for entertainment purposes and profit.

5.

The likelihood of such a miscarriage of justice should have been apparent to the Defendants from the beginning. It is certainly apparent in retrospect, because this ill-fated spin-off series (The original series "Cold Case" was popular for several years) was cancelled little more than a month after its debut, after only 10 episodes.

6.

The production team of Defendants Wolf, Magical Elves, Siegler, Garrett, O'Neill, and Alvarado used every imaginable scenario to ensure the final product, the broadcast which is the subject of this case, made Johnell LeDoux look as guilty as possible. In this effort, those Defendants engaged the significant assistance of the Lake Charles City Police and other state

---

[1] The original, veteran detective, Denise Hughes, closed the case after her investigation 25 years before the actions complained of.

agencies and officials in several ways, including directing the time and place of LeDoux's arrest; staging, with official vehicles, a fake high-speed chase which never happened; setting up cameras at the site of LeDoux's actual arrest, which happened at his residence without warning or notice; setting up cameras in the facilities of the Lake Charles City Police to film Ledoux's entry into the building and subsequent interview with Lake Charles City Police officers and detectives, which interview was in fact filmed by employees of the production staff of the show; examining evidence from the 1992 incident held by the Lake Charles City Police and having an opportunity to compare the evidence to the story of the complaining witness; interviewing the complaining witness about her story without comparing her assertions to the evidence, when such a comparison would reveal the witness was lying, and, thus, suborning perjury; setting up a new location for filming the "scene" of the 1992 incident, picking a location which, by its nature, lent credence to the fictionalized version created by these defendants; asserting prominently during the resulting program that there had been a 911 call made from a nearby residence in 1992, even though these defendants had access to a witness who lived at that residence, at that time, and said no such call was made; and finally, by narration, dramatic editing, sound effects, and selecting the overall message of the final edition of the broadcast, presenting an overwhelming, though false, narrative that Johnell LeDoux was guilty of aggravated rape.

7.

A jury in Calcasieu Parish, Louisiana, having heard the evidence procured by these Defendants, delivered a unanimous verdict of acquittal within 90 minutes. Johnell Ledoux is, and always was, innocent of this charge at the time of the initial investigation, and no new evidence justified its being revived in 2015. These Defendants, seeking profit and not justice, did nothing more than re-engineer the original evidence and coax perjured testimony from a former crack-

addicted prostitute, apply the Hollywood touch, and send Johnell Ledoux to jail with an impossibly high bail for two years; maliciously conjure a prosecution from state officials, and by doing so usurped the public function of the State. In addition to the improper participation by these defendants in the fictionalized "re-investigation" of the cleared 1992 case, Defendants informed State officials that no national television program would in fact result unless Ledoux was indicted by a grand jury.

8.

The investigation of a reported crime is an inherently public function, meant to be done by sworn law enforcement officers. But in this case, through the promise of fame, investigative assistance, publicity, and perhaps other incentives, the Defendants targeted Johnell Ledoux for their use in an entertainment enterprise for profit. Each defendant brought its own special dimension to this ultimate conspiracy between the entertainment industry and Louisiana law enforcement. Dick Wolf, the principal of Wolf Films, Inc., has a career-long association with law enforcement, including his acclaimed Law and Order series and its several related shows. Defendant Siegler is a well-known former prosecutor for Harris County, Texas, who was ultimately stripped of her authority and dismissed after multiple findings in Harris County courts that she had committed prosecutorial misconduct, most prominently failing to disclose exculpatory evidence. Defendant Alvarado is a well-known criminal investigator from Los Angeles who has worked both for various Prosecution agencies and for the Los Angeles County Public Defender. Defendants Garrett and O'Neill used their prior law enforcement and prosecution or general investigative background to bolster their status as on-air personalities to present this case in broadcast form. TNT, as the initial broadcaster of this series and the episode at issue, owed a duty of care, supervision, and review to ensure any product broadcast through its

facilities was in keeping with standards imposed both legally and by the usual ethical business practices of the entertainment community. All Defendants owed a duty of care to Johnell Ledoux, an innocent man who never agreed to participate in this made-for-television production, to act in accordance with their various professions and in accordance with the standard of a reasonable person in similar circumstances. But all defendants breached that duty, resulting in injury and damage to Johnell Ledoux, his wife Arvet, and their minor child, as set forth below.

9.

Although the State agencies of Louisiana participating in this false imprisonment and malicious prosecution are certainly not morally blameless, they are afforded a broad immunity by Louisiana and Federal law, and, thus, are not named as Defendants. But the circumstances of this particular case, as spelled out in the facts alleged, make it clear the driving force behind this false production were the Entertainment Industry Defendants. This case didn't make it onto national television from the obscurity of a 23-year-old closed file in a dusty warehouse under the jurisdiction of the Lake Charles City Police without help. That help was provided by the Defendants, jointly, severally, and by acting in concert, who subsumed the powers of the State of Louisiana by performing those public functions themselves, with the significant assistance of the State Actors involved. This renders them liable as State Actors under the Constitution of the United States and the statutes cited hereinabove.

10.

The defendants TNT compounded the problem by broadcasting the episode in question almost from the time of Johnell Ledoux's arrest until his trial and acquittal on November 8, 2017, running the risk of prejudicing any jury against him by broadcasting a false version of events. Because TNT initially placed this false episode into the general stream of commerce, it

was ultimately broadcast, free or available for purchase, on many popular internet platforms, including YouTube; Prime Video; VUDU; Google Play; and Netflix, where it was available for view to subscribers until October 1, 2018. TNT and the other Defendants associated with this program received compensation every time this episode was viewed, either by contract or otherwise, and compounded the injury to Plaintiffs' rights to privacy. At no time during that long history of broadcast did any Defendant take any step to reflect the final jury verdict of acquittal issued by the Calcasieu Parish jury on November 8, 2017.

## II.

### SECOND CAUSE OF ACTION

**Claim for Personal Injuries by Johnell Ledoux and his wife Arvet on their own behalf and on behalf of their minor son, against all defendants for invasion of privacy, slander, defamation *per se*, defamation by depicting Johnell Ledoux in a false light, intentional infliction of emotional distress, damage to his reputation, psychological damages and loss of time with his family, and loss of earnings and earning capacity due to physical and psychological injuries negligently or intentionally inflicted upon him by these defendants, and other injuries as may be inferred from the evidence**

11.

Plaintiff now states his Second Cause of Action, and in connection therewith reurges, realleges, and reproduces all allegations of fact against all Defendants made in his First Cause of Action.

12.

The Defendants, with the assistance and encouragement of officials of the State of Louisiana and its political subdivisions, procured the investigative file from the Lake Charles City Police of a closed sex crimes investigation conducted by Denise Hughes in 1992.   As recounted hereinabove, the Defendants set out to fictionalize and misrepresent the facts of that incident in such a way as to point a finger of blame at Johnell Ledoux. The facts as broadcast

were actually television fiction, intended to call Johnell Ledoux a guilty criminal who had committed aggravated rape. As a jury found on November 8, 2017, that is false. What follows is a narrative of the facts, as revealed by the 1992 investiation as well as by Ledoux himself.

13.

At around 10 p.m. on October 20, 1992, then 19 year old LeDoux met a then 34-year-old crack-addicted prostitute and her friends at the Vallery Hotel on Enterprise Boulevard in an area known for drug activity and prostitution. Because he was under 21 and could not purchase liquor, the teen gave $50 to one of them to purchase alcohol at the Pink Elephant, a package liquor store in the same crime-ravaged area near Enterprise Boulevard.  When she did not return with either the liquor or his change, the 19 year-old LeDoux could not pay for a hotel room, which he had intended to do for the purpose of having sex with the prostitute.

14.

The prostitute, dressed in skinny jeans and a shirt, with shoes on her feet (all items of clothing were seized by the LCPD and were made available to Defendants during their television production), suggested she knew a place where the teen and she could have sex in return for drugs he purportedly had. She then took the boy to an abandoned house believed to have had the address of 1331 N. Railroad Avenue where she put a condom on LeDoux and engaged in a sexual act. Ledoux never paid the prostitute, because he did not have the drugs he had said were in his possession.  After the sex act, he fled on foot. Thereafter, in an obvious attempt at revenge for her non-payment, the prostitute was stopped by Lake Charles Police Department officers for a field interview. It was then she reported a rape with the perpetrator having a gun. A used condom, supplied by her and used by LeDoux, was collected as evidence. The case was assigned to veteran Detective Denise Hughes. Taking in all of the available evidence, Hughes closed the

case and determined it was a drug deal for sex. Hughes retired from the department as a Captain; she died in 2017.

15.

From October 20, 1992 until the 2015 events set forth in this Complaint, no person was identified, charged or arrested for the rape of Beverly Weathers Tutson, as the case had been closed.

16.

In April, 2015, defendants Garrett, O'Neill and Alvarado arrived in Lake Charles, Louisiana and met with representatives of the Lake Charles City Police, the complaining witnesses, and others, for the specific purpose of opening rape cases. Instead, it resurrected the closed case of what had been determined to be a sex act for drugs. So, the closed case was re-opened for the camera and investigation was undertaken by Defendants at the direction and control of defendants Siegler, Garret, O'Neill and Alvarado, acting on their own behalf and as employees of Defendant Magical Elves, Inc., wherein several individuals were interviewed, including a witness who provided exculpatory evidence to any suspect. That witness, denied that a 9-1-1 call was made from her father's home-which had been identified by the complaining witness and friends as the place it was made-on the night of the alleged aggravated rape.

17.

25. Defendants Siegler, Garret, O'Neill and Alvarado, acting in concert and civil conspiracy with representatives of the Lake Charles City Police and other agencies, were provided unbridled access to the police files, records, police facilities, and any needed assistance. With the significant assistance of those state law enforcement personnel, the Defendants were allowed to act as law enforcement officers; stage scenes that never happened; stage an arrest and

11

transportation to the police station; ignore exculpatory evidence and ignore the closed status of the 1992 investigation.

18.

The physical evidence collected at the time of the prostitute's sexual encounter with the plaintiff, including the skinny jeans, intact thong underwear and the condom she provided the plaintiff, were forensically examined on behalf of the Lake Charles Police Department, and made available to the Television Defendants, as well as any other evidence. However, even though the forensic evidence was preserved, there was no copy of any report of any investigation; any statements taken; or any other evidence from the original 1992 file.

19.

Defendants affiliated with the filming of the episode in question were aware of the destroyed or lost evidence, of veteran Detective Denise Hughes' conclusion that no rape had occurred and that it was more likely than not consensual sex between a prostitute and her "john" for drugs; the statement of a the occupant of the house where the 911 call was allegedly made that it never happened; that the complaining witness' allegation that the plaintiff tore her underwear during the "rape" was not supported by the evidence. But knowing that, these defendants intentionally, maliciously, and guided only by profit motive, defamed plaintiff. And in reckless disregard of plaintiff's civil rights, presented plaintiff in a false light as a rapist, and, true to the history of Defendant Siegler, never presented any of the exculpatory evidence during the "Cold Justice: Sex Crimes" television production.

20.

The initial law enforcement reports for October 20, 1992 indicated the detective in charge dismissed the events of the night as consensual sex between a prostitute and a "john".

21.

Contrary to the facts of the investigation conducted in 1992, and finding no additional facts to support a charge of aggravated rape, Defendants Garrett, O'Neill and Alvarado concluded their investigative work with local officials by reaching the agreed-upon conclusion that plaintiff had not engaged in consensual sex with a crack addicted prostitute, but had raped her, and Defendants secured an agreement with the law enforcement officers to present those conclusions to the Calcasieu Parish District Attorney's Office for charges against plaintiff. The television show's employees, including Garrett, O'Neill and Alvarado, advised local law enforcement that the television production would not be published unless an indictment was filed.

22.

On or about May 1, 2015 plaintiff was arrested and held on $850,000 bail until his trial ended with his acquittal on November 8, 2017. On the same day, LCPD Chief Don Dixon conducted a press conference/release, announcing Plaintiff had been arrested for aggravated rape. Although the investigation had been conducted by Defendants, with the significant assistance of public law enforcement officials, using law enforcement facilities and equipment, Dixon announced that his office had reopened a closed investigation.

23.

On or about August 7, 2015 defendants TNT, Wolf and Magical Elves broadcast the television production known as "Cold Justice: Sex Crimes Season 1, Episode 2" for general public consumption depicting plaintiff as guilty of aggravated rape of the prostitute in 1992. This broadcast was false, which the Defendants knew or should have known, and was broadcast either knowing its falsity or with reckless disregard off the truth. The broadcast of these false

allegations constitutes defamation *per se*, defamation under the law of Louisiana, defamation by picturing Johnell Ledoux in a false light, and invasion of privacy. The Defendants knew, or in the exercise of ordinary care should have known, that this broadcast would cause injury to Ledoux and his family. The broadcast did not serve a public interest.

24.

A jury trial was conducted in due course, which resulted in a not guilty verdict in favor of plaintiff being reached on November 8, 2017, and plaintiff was released from custody after 269 days incarceration.

25.

Defendants TNT, Wolf, Magical Elves, Garrett, O'Neill and Alvarado, jointly and severally, caused to be published "Season 1, Episode 2" of the television production "Cold Justice: Sex Crimes" when it was broadcast on major network television for general public consumption and the production concluded that plaintiff was the perpetrator of the rape of the complaining witness. After its initial publication, the broadcast continued to be available on various network and internet distributions. The broadcast invaded plaintiff's privacy by placing him before the public at large in a false light, containing false and inaccurate statements about plaintiff. The false light in which plaintiff was placed would be highly offensive to a reasonable person because it depicted plaintiff as the perpetrator of an aggravated rape rather than the consensual sex that was indicated by the evidence gathered through the closed investigation in 1992.

26.

Plaintiff, his wife and family sustained damages as a direct and proximate result of defendants' invasion of privacy, defamation *per se*, reckless disregard for the truth, and other actions as set forth hereinbelow.

27.

The injury to Johnell Ledoux and his family did not end with the initial broadcast of August 7, 2015, but continued each and every time the broadcast was shown, exhibited, purchased from a third party by contract with defendants, or televised in any way. Although Defendants had an opportunity to correct any errors in their broadcast, they did not. Although Defendants had an opportunity to present the program as a fictionalized version of events, they did not. Although the Defendants had an opportunity to pull the program from public view after the trial of Johnell Ledoux proved the "evidence" gathered for this television drama was false, perjurious, and wrong in material respects, as revealed by Johnell Ledoux's trial, they did not. Although the Defendants had an opportunity to at least add the fact of Johnell Ledoux's acquittal as part of the broadcast after November 8, 2017, they did not. The last time this program was freely available, October 1, 2018, on Netflix, it contained the same discredited information, the same perjured testimony, the same simple errors of fact. These failures to exercise even the most basic kind of fairness compounded the injuries sustained, and show the malicious nature of the conspiracy engaged in by these Defendants, and their violation of even the most basic concepts of due care.

### III. DAMAGES

**Plaintiffs Johnell Ledoux and Arvet Ledoux and their family sustained significant damages as a result of the actions of the Defendants, including but not limited to damages for intentional infliction of emotional distress; loss of consortium; psychological and physical injury; losss of enjoyment of life; loss of income, past, present, and future; and are entitled to punitive damages, attorney's fees, and costs as a result of the violation of their civil and Constitutional rights.**

28.

Plaintiff Johnell Ledoux personally suffered damages for the violation of his civil and constitutional rights; wrongful imprisonment; malicious prosecution; defamation; and other injuries as set forth hereinabove, and is entitled to damages from these Defendants, jointly and severally, as a matter of law.

29.

As a result of these false charges, Johnell Ledoux was deprived of the consortium and company of his family, giving him, his wife Arvet, and their minor child a claim for damages for loss of consortium under Louisiana and Federal law.

30.

Plaintiff also sustained personal injuries for his forced and wrongful arrest, imprisonment, and trial, including but not limited to pain and suffering, both physical and mental; continuing symptoms consistent with Post Traumatic Stress Disorder; loss of enjoyment of life; loss of reputation; loss of opportunity to work and earn income. These damages have been sustained in the past and will continue for the rest of his life.

31.

Plaintiff has sustained loss of income, past present and future, at least in the total amount of $1 million. Plaintiff incurred attorney fees in his defense of these false charges in at least the

amount of $100,000. Plaintiff will incur reasonable attorney fees in the prosecution of this action in at least the amount of one-third of his total award, and is entitled, because of the Defendants' violation of his civil rights and pursuant to the provisions of 42 U.S.C. 1983 is entitled to recover those fees, all costs associated with the prosecution of this action, and punitive damages as a matter of law. These damages have been continuing to accrue since the initial broadcast of this television production, and will accrue in the future as long as it remains available.

### IV. JURY TRIAL DEMAND

32.

Plaintiffs desire, and by law are entitled to, a trial by jury herein and hereby demand same.

**WHEREFORE, PLAINTIFFS JOHNELL AND ARVET LEDOUX, FOR THEIR OWN ACCOUNT AND ON BEHALF OF THEIR MINOR SON, PRAY:**

1. That this complaint be filed and processed in the form and manner required by law, certified by the Court, and after service on the Defendants, they be required to appear and answer same; and after all due proceedings have been had, that there be **JUDGMENT** in their favor and against the defendants, jointly, severally, *in solido*, and as a result of the civil conspiracy into which they entered, finding Defendants liable for defamation *per se,* defamation under Louisiana law, violation of Plaintiff's civil and constitutional rights, and otherwise for the relief available under law based on the allegations of this Complaint; for general and special damages, plus punitive damages and attorney fees as allowed by law; and

2. For trial by jury.

By Attorney:

**JAMES B. DOYLE, SR. (LA. 05061)**
**Attorney at Law**
2104 Constance Lane
Lake Charles, LA 70605

(337) 794-5406  (cell)

jbdoyle@mac.com